[No. 3185.]

### MARION BEATEY *v.* THE STATE.

1. PRACTICE—CONTINUANCE is properly refused in the first instance when the application fails to allege that the applicant has no reasonable expectation of being able to secure the attendance of the absent witnesses during the term of the court by a postponement of the trial to a future day thereof.

2. SAME—NEW TRIAL—PRACTICE IN THE COURT OF APPEALS.—While the overruling of an application for a continuance is not, *per se*, the subject of revision by this court, yet the application should be taken into consideration by the court below in passing upon the defendant's motion for new trial, and will be considered by this court in revising the action of the court below in refusing a new trial. See the statement of the case for evidence set up in a motion for new trial, which, considered in the light of the evidence adduced, demanded the award of a new trial.·

3. SAME —The rule stated, however, is not ordinarily applicable to a case wherein it appears that the desired testimony was supplied from other sources, and that no injury resulted to the defendant by the action of the court in refusing the continuance.

APPEAL from the District Court of Bastrop. Tried below before the Hon. L. W. Moore.

The conviction was for the robbery of S. B. Johnson, in Bastrop county, Texas, on the first day of February, 1883, and the punishment imposed was a term of two years in the penitentiary.

S. B. Johnson was the first witness sworn for the State. He testified that he lived in Williamson county, Texas. On the first day of February, 1883, the witness went to McDade, taking a load of cotton seed with him. Mr. Simmons gave the witness one hundred and seventy-five dollars with which to purchase a · draft from Mr. Milton. The witness paid of this money, on Mr. Simmons's account, fifteen dollars to Mr. Benson and nine dollars for a safe. Mr. Milton was not at home, and consequently the witness gave Mr. Freeman the note which Mr. Simmons had given him with the money. While Freeman was reading the note, the witness saw the defendant standing near by. He was standing immediately behind the witness. At that time, alluding to Mr. Milton's absence, the witness told Freeman that he would have to take the money back with him. The witness then went

to the postoffice, and saw the defendant there. He saw, also, a gotch eared sorrel horse, hitched near the postoffice.

When the witness had traveled perhaps two or three hundred yards on his road home, he saw another man standing on the ground, fixing something, his coat the witness thought, behind his saddle. When the witness got about half a mile from the town, the defendant, riding the gotch eared sorrel horse, and another man, overtook him, and rode some distance on the road with him, engaging him in conversation. They told the witness that they wanted to buy his mules. They asked the witness where he was going, and then what road he would take to get there. The witness told them that at a certain place ahead he would take and travel the right hand fork of the road, The two men then rode on ahead of the witness. When the witness reached the forks, instead of taking the right he took the left hand fork, and after he had traveled that road some distance, he looked across the country and saw two men coming toward him from the other road. It was then growing dark, and the witness could not recognize the parties approaching as the two men he had seen, but took them to be the same.

About a quarter or half a mile further on, and in the direction of the house of Jack Beatey, a man stepped suddenly into the road from behind a tree, making the witness's mules shy to the right. Witness stopped his team and the man asked him the road to Bastrop, saying that he came from Taylor, and had been traveling all day. The witness told the man that the road he was on would take him to McDade, where he could get minute directions. Witness then started his mules, but the man halted him, saying: "Hold on; what is your name?" Witness replied: "My name is Sam Johnson." Thereupon the man pulled out a revolver and said: "I had a difficulty once with Sam Johnson, and I swore then that if I ever met him again I would kill him, and, by G--d, now I am going to do it." He then told witness to get out of the wagon. The witness started to get out on the opposite side from him, when he ordered the witness to get out on his side of the wagon. Witness did so. The man then asked him if he had any money, and the witness replied that he had a little. The man then said that money was what he wanted, and witness gave him what he had in his pocket, amounting to about two dollars and eighty-five cents. The man remarked: "I know this is not all you have got. I am going

to search you and the wagon, and if I find more than you have given me, I will kill you."

In view of this threat the witness then went to the wagon and got out a bag containing fifty-one dollars, which he gave the man. The man said: "That is not all." Witness then started to put his hand in his coat pocket, when the man said: "Hold on, I will attend to that." He then put his hand in witness's pocket and pulled out a silk handkerchief, which he examined and appropriated. He then pulled from the pocket of the witness an almanac, and asked the witness what it was. Witness replied: "It contains one hundred and fifteen dollars." He put the almanac in his pocket, and said: "You step out there; I will settle with you for this." Witness replied: "You have got my money now, but of course you can kill me also." The man then asked witness if he was going to report the matter when he got home. Witness replied that he could not see that he would be benefitted by telling it. The man then told the witness to drive on, but that if witness told he would kill him. Witness started to get into his wagon when the man said: "Hold on; take the lines and drive on." He walked along with the witness for perhaps one hundred yards, when he shook witness's hand, pulled witness's head down to his face and said: "Good bye. We part as friends."

All of this took place in the road, about four and a half miles from McDade, and about a quarter of a mile from Jack Beatey's house. It was about eight o'clock on a dark, moonless night. The witness recognized the man by his voice. The defendant is the man who robbed the witness in the manner, at the place, and on the occasion stated. The witness had never seen the defendant to his knowledge until he saw him that day in Mc-Dade. He did not then know defendant's name. The defendant wore no hat at the time of the robbery, but had his head covered with a handkerchief. The handkerchief did not cover his face, but came down on his face about as low as a hat would have done. When the witness reached a point about two miles from where the robbery occurred, he discovered that the envelope containing the one hundred and fifteen dollars had slipped from between the leaves of the almanac and lay intact in his pocket. The country to the left of the road at the point where the robbery occurred was timbered, and open prairie lay to the right. Mr. Simmons, Mr. Hal Hill and the witness were on the ground next day, and found where two horses had been hitched

about one hundred yards from the road. The witness did not see the man who robbed him after the robbery, until he saw him at the examining trial. He then recognized defendant as the guilty person, as soon as he saw him. The money taken from the witness was in one dollar silver pieces, as alleged in the indictment. All of this occurred in Bastrop county, Texas, on the first day of February, 1883.

Cross-examined, the witness reiterated his identification of the defendant as the party who robbed him, and said that he saw him for the first time that day at Milton's store, and then at the postoffice in McDade. He did not mention the fact of seeing him in McDade on the examining trial, because he was asked no question directing his attention to the fact. He was, he supposed, sworn on the examining trial to tell the whole truth about the matter, and all of it, but the question as to whether or not he saw the defendant in McDade that day was not asked him. (Witness's statement before the examining court, as appears from his written testimony, was as follows: "When I got about a half a mile from town, the defendant here in court, whom I recognized, and another man overtook me.") The witness saw Mr. Simmons on the same night after the robbery, and gave him what money he still had left. He told Simmons that the man who rode the gotch eared horse was the man who robbed him. Mr. Bishop sent for the witness to make affidavit against the defendant, sometime in January, 1884. That was after the trouble that occurred in McDade on Christmas, 1883. Milton and Bishop did not tell the witness to make the affidavit, and that they would furnish the proof to convict. Witness did not tell Oliver, in the presence of J. J. Young, at Oliver's gin, in Williamson county, about the middle of January, 1884, that "they said for me to make the affidavit and they would furnish the proof." Witness made no such statement in reply to Oliver's question: "How is it that you can make an affidavit against Beatey when you have said that you could not recognize him, and while it can be proved that Beatey was sick in bed at the time of the robbery?" The witness did not tell Young or Oliver, in Young's presence, at Oliver's gin or at Rivers & Gresham's store, in July or August, 1883, that the man who robbed him was disguised or had a handkershief over his face, so that witness could not recognize him.

The foot tracks along the road (where defendant walked with witness) looked like they were made by a shop made boot. They

had small heels, and it was decided by the parties who made the examination that the tracks were made by a shop made boot. Witness could not tell the size of the boot by number. The witness emphasized his denial that he ever told Oliver at his gin in Williamson county, in the presence of Young, in January, 1884, or at Rivers & Gresham's store, or any where else, at any time, that he could not recognize the robber and did not know who he was. He did tell Oliver and others that he did not know the name of the man who robbed him; that he did not know him as Marion Beatey, but that he intended to attend the examining trial of the defendant, and that if defendant, calling himself Marion Beatey, was the man who robbed him, and he recognized him as the man, he was going to say that he was the man, and if he could not recognize him he intended to say so.

S. G. Simmons was the second witness sworn for the State. He testified that on the morning of February 1, 1883, he gave Mr. Sam B. Johnson one hundred and ninety dollars to take to McDade for him. Johnson was to pay to one party the sum of nine dollars, to another the sum of fifteen dollars, and with the balance purchase a draft of Mr. Milton for the witness. Johnson brought back only one hundred and fifteen dollars. Counting over his money, witness found that he was short fifty-one dollars. When Johnson got back that night he told the witness that he had been robbed, and he thought he was robbed by a man he saw in McDade, riding a gotch eared sorrel horse. On the next morning the witness went with Johnson to the place where he said the robbery took place. It was about three and a half miles from McDade, and about two hundred yards from Jack Beatey's house. They found where two horses had been hitched, and had eaten the leaves and twigs from the bushes. The track of but one horse led from that point across the road toward Jack Beatey's. The leaves on the ground were so dry that the tracks of the horses leading to the place where they had been tied could not be found. The tracks of but one man were found behind the tree. The tracks of two men led along the side of and up the road for about one hundred yards. One of these tracks resembled Johnson's very much, while the other was a medium sized track with a small heel, in size about a number eight or nine. Johnson said at the time that he did not know the man who robbed him, but described the gotch eared sorrel horse.

Thomas Lemaster was the next witness for the State. He testified that he first heard of the robbery on the day after it oc-

curred. On the day of the robbery the witness and Tom Bishop took dinner at the house of the defendant's father, and saw the defendant there at the time. The parties were gathering cotton at the time. Defendant helped drive up cattle after dinner, and then left, saying that he was going to McDade for some medicine. He left, going in the direction of McDade, which was about three miles distant. Defendant was then riding a gotch eared sorrel horse. This was on or about the first day of February, 1883. Witness heard of the robbery next day. When defendant left, going to McDade, he said that his brother Az was sick, and that he was going after medicine for him. At this point the State closed.

J. J. Young was the first witness for the defense. He testified that he was present at Oliver's gin, in Williamson county, shortly after the affidavit upon which this prosecution is predicated was filed by the State's witness Johnson, when the witness, Johnson and Oliver had a conversation regarding this alleged offense. The parties named were at the time working at the pump. Oliver asked Johnson if he had made an affidavit against the defendant. Johnson replied that he had. Oliver then asked him how it was that he could make an affidavit against any one when he had always said that he could not tell who robbed him. Johnson replied that all he had to do was to make the affidavit, and that "they" would make the proof. Witness could not be positive that Johnson said that "they" meant Bishop and Milton, but witness so understood him. On several occasions, at Oliver's store and at Rivers & Gresham's store, during the summer, and in the months of July and August, 1883, the witness had heard Johnson say that he did not know who robbed him; that the man who robbed him had a handkerchief or something white on his face, and that he could not tell him were he to see him again; that it was dark at the time, and that he had no idea who the robber was.

Cross-examined, the witness said that he did not pay very strict attention to what was said by the parties at the several times, and could not swear positively to the language used. Johnson addressed Oliver on the occasions spoken of. Witness would not swear positively to anything Johnson said about the robbery.

H. H. Hasley was the next witness sworn for the defense. He testified that he had never known the defendant to own a one eared or a gotch eared horse. Az Beatey owned such a horse at

the time of the alleged robbery, but it was then in the possession of Thad. McLemore. McLemore was engaged in the butcher business in McDade, and had the gotch eared horse in use at the time. The defendant had never worn shop made boots. He customarily wore Batchelor's brogan boots, and rarely ever wore shoes.

Cross-examined, the witness stated that the defendant was his son-in-law. Thad. McLemore used the gotch eared horse because he had lost his own horse by drowning. He got the gotch eared horse in the fall of 1882. A brother of Thad. McLemore was married to one of defendant's sisters. All of the Beatey boys frequently rode the gotch eared horse.

R. J. Stevens testified, for the defense, that Az Beatey owned a one eared, or gotch eared, sorrel horse, which Thad. McLemore got in September, 1882, and kept until the following spring. That horse had fallen over a bluff and broken his neck since Az Beatey got him back, and was now dead. Az got him back from McLemore in April, 1883.

William Cruse testified, for the defense, that he knew Thad. McLemore, and lived near him during the winter of 1882–3. Thad. used during that time a one eared, or gotch eared, sorrel horse called "Punkins," that belonged to Az Beatey. Thad. worked this horse between McDade, where he had a meat market, and his slaughter pen. Witness did not know that he had ever seen Thad. riding old "Punkins." Defendant lived near old man Beatey's.

Alice Beatey, the wife of the defendant, testified, in his behalf, that she was living at old man Beatey's on the first day of February, 1883. The defendant, at that time, had been sick for four or five weeks. Witness heard of the alleged robbery on the day after it was said to have occurred. The defendant was confined to his room the whole of the day on which Johnson was said to have been robbed; he did not leave home that day. Some time after the alleged robbery Bishop and Lemaster came to the house, and the defendant went off with them. He went to McDade for medicine, and was sick and under medical treatment at the time. Jack Beatey told witness of the reported robbery the day after it is said to have been committed. Az Beatey was sick from January 21, 1883, until some time in March. Witness was present at the examining trial, but was not called as a witness, and therefore did not testify.

Blanche Beatey testified, for the defense, that she was the wife

of Jack Beatey. Johnson was said to have been robbed on or about February 1, 1883. Witness's children were sick at the time, and witness and Jack had been trying to get some money from Bob McLemore, who was then living with them. On the evening of the alleged robbery of Johnson, Thad. McLemore came by witness's house to bring some blueing he had purchased for them in McDade. The witness thinks he, Thad., was then riding old "Punkins." He asked for Bob McLemore, and he and Bob went to the lot together and had a conversation, which witness did not hear. Bob came back to the house, got an old pistol from the shelf and left, and returned in about an hour, and he and his wife went into the dining room, where witness heard them counting money. Witness looked through the door and saw them, Bob McLemore and his wife, counting silver. Thereupon witness went and told her husband that some one had been robbed, and that he would hear of a robbery next day. Witness's husband, who had been sitting up with Az Beatey, had gone to bed. The next morning the witness and her husband examined Bob McLemore's coat, and found twenty silver dollars in the pocket. Soon after that they saw some men down on the branch looking around, and witness remarked to Bob: "There are some men looking for you now." Bob replied: "If any body says anything to you, you tell them that I was here all of last night." He then took the money and hid it. On the seventh day of that month witness and her husband went to old man Beatey's, and her husband said that he was going to Mr. Simmons's. Witness was at old man Beatey's house when Bishop and Lemaster came there. That was seven or eight days after the robbery. The defendant on that day went off with Bishop and Lemaster. Thad. McLemore came to witness's house on the night of the robbery, riding a horse that belonged to Az Beatey. He left, riding that horse, and Bob followed shortly on foot.

Cross-examined, the witness said that the defendant and Az Beatey were living at old man Beatey's at the time of the robbery. Jack Beatey, witness's husband, lived about two and a half miles distant, with Bob McLemore. Jack said that he was going to tell Mr. Simmons who perpetrated the robbery, because it occurred so near his house that suspicion might attach to him.

S. G. Simmons was then placed upon the stand by the defense. He testified that four or five days after the robbery he heard that Jack Beatey had told Johnson who it was that robbed him,

Johnson, and in consequence, he, witness, went to old man Beatey's to see Jack. Jack told him that Bob McLemore robbed Johnson. Witness asked Tom Bishop to help him apprehend the party who robbed Johnson. Bishop replied that he did not live in the county and would have nothing to with it. When witness heard that Bob McLemore committed the robbery, he spoke of having him arrested, but Jack Beatey advised him not to, saying it would do no good, as Bob would prove out of it.

Eliza Beatey, the mother of the defendant, testified in his behalf that the defendant was at home, sick, on the night of the robbery. On the next night Jack Beatey told the witness who perpetrated the robbery. Witness remembered when Bishop and Lemaster came to the house. It was at least six days after the robbery.

Cross-examined, the witness said that the defendant had been sick for some time before the robbery, and was then under medical treatment. Sometimes he would be confined to his bed, and at other times he would not. Az was taken sick with erysipelas in his arm on January 21, 1883. Witness did not think the defendant went off with Bishop and Lemaster the day they were there, but he may have done so. If he did, he did not go for medicine for Az. Defendant may have been out of the house some days without the witness knowing it.

Tom Bishop was introduced by the State in rebuttal. He testified that he lived in Williamson county. He heard of the robbery the day after it occurred. Witness saw the defendant at old man Beatey's on the day of the robbery. Witness and Thomas Lemaster took dinner there that day about noon. Defendant, riding a gotch eared sorrel horse, rode a short distance with witness after dinner, and left them, saying he was going to McDade to get medicine.

Cross-examined, the witness said that he was not instrumental in securing the arrest of the defendant, but he sent word to Johnson to come to McDade and help him sift all of the robberies that had occurred in that section, and run all robbers out of the county. This was after the witness's trouble with the Beatey boys at McDade, on December 25, 1883. Witness saw Mr. Summers with a party of men soon after the robbery. Summers asked him to help him apprehend the robber. Witness declined, saying that he did not live in the county, and did not like to be mixed up with the matter.

The application for continuance referred to in the head notes

and opinion was based upon the absence of the witnesses W. C. Oliver and Nancy Elder. After setting forth the diligence used to secure their attendance, the application averred that the defendant expected to prove by the said Oliver that, on or about the fifteenth day of February, and on divers days thereafter, at Oliver's gin and Rivers & Gresham's store, in Williamson county, Texas, Johnson, the prosecuting witness, told him, Oliver, that he did not know the robber, and had no idea who he was; that, after Johnson filed the affidavit charging the applicant with the robbery, he, Oliver, asked him, Johnson, how he could make the affidavit, not knowing who the robber was, and that Johnson replied that Milton and Bishop told him if he would make the affidavit they would furnish the proof.

The application alleged that, by the witness Nancy Elder, the appellant could prove that he was sick at his father's house at the time of the robbery, and had been sick and confined to his bed for several days before, and continued to be so confined for several days after the alleged robbery.

The motion for new trial presented the questions discussed in the opinion.

*Jones, Johns & Scott*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. The only real question presented by the record on this appeal hinges on the correctness of the final action of the court upon defendant's application for a continuance. When first presented it was unquestionably properly overruled by the court, because it failed in one of the statutory requirements, in that it did not allege that there was no reasonable expectation of securing the attendance of the absent witnesses during the term of the court by a postponement of the trial to a future day thereof. (Code Crim. Proc., Art. 560, subdiv. 6; *Strickland* v. *The State*, 13 Texas Ct. App., 364.) But, as was said in *Strickland's case*, "while the overruling the application would not in the first instance be the subject of revision by this court, yet it should be taken into consideration by the court below in passing upon defendant's motion for new trial, and will be considered by this court in revising the action of the court in refusing a new trial." (P. 371; see also *Stanley* v. *The State*, decided at the present term, *ante*, p. 392.)

It is urged, however, as an additional reason for sustaining the court on the motion for new trial, that the refusal of the continuance asked was not error because it appears that the testimony of the absent witnesses was fully supplied from other sources, and that no injury resulted to the defendant. This proposition, if warranted by the facts, is supported by authority. (*Parkerson* v. *The State,* 9 Texas Ct. App. 72; *Allison* v. *The State,* 14 Texas Ct. App., 402; *Wooldridge* v. *The State,* 13 Texas Ct. App., 443.) In this case, however, the evidence adduced does not supply that sought from the absent witnesses in more than one material respect.

Under the peculiar circumstances of this case as made by the evidence, we are of opinion that the court erred in not granting a new trial, when the proposed evidence stated in the application for continuance is considered in connection with that elicited on the trial. That it was material is evident; that it was not probably true is not made sufficiently manifest by the testimony adduced.

The judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*

Opinion delivered June 11, 1884.